2022 JUN 10  AM 11: 03

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL COMPLAINT NO:
22-CV-_____

RANDALL BOCK M.D.                     )
              Plaintiff,            )
V.                                    )
                        )
CANDACE LAPIDUS SLOANE                )
and GEORGE ABRAHAM, both solely in    )
their individual capacities,          )
           Defendants.           )

JURY DEMANDED

VERIFIED COMPLAINT
FOR VIOLATION OF THE SHERMAN ACT
(15 U.S.C. §§ 1–7)

CONCISE SUMMARY OF CLAIM

1      Defendants abused their positions as Chair and Vice-Chair of the Board of Registration in

Medicine to unlawfully interfere in the medical marketplace in Massachusetts to eliminate the

plaintiff's business from interstate commerce because he did not commit himself to requiring his

patients to purchase Suboxone month after month indefinitely for the rest of their natural lives

(Lifetime Subscription Model), and instead offered them the opportunity to slowly taper off over

5-6 months to see if they could live without Suboxone daily. Defendants treated plaintiff as a

threat to the Lifetime Subscription Model and destroyed him, *pour encourager les autres*, in

defiance of actual state policy which to this day supports detoxification.

PARTIES

2      Plaintiff Randall Bock M.D. is an experienced physician first licensed in Massachusetts

in 1984 after graduating from the University of Rochester. Plaintiff had a thriving general

1

practice in Revere, Massachusetts, with regular patients from many of the New England states, and ended up owning the building where his practice was located. Defendant Sloane became Board Chair in 2012. Plaintiff's license was summarily suspended for the first time in 2014, and was left suspended all the way through October 2019, then briefly restored, then suspended again just two (2) days later. Plaintiff lives and works in this District.

3       Defendant Candace Lapidus Sloane joined the Board of Registration in Medicine in July 2011 and stayed on as board member continuously until June 2020. State law prohibits any member staying on continuously for more than six years. In Rhode Island, and per the federal government, defendant's name is Candace Susan Lapidus. In Massachusetts, defendant goes by Candace L. Sloane. Defendant Sloane is a physician who lives at 45 Stonecrest Drive, Needham MA 02492, in this District.

4       Defendant George Abraham is a physician who served as Vice Chair under Sloane (then followed Sloane as Chair) and actively colluded with Sloane in destroying plaintiff's thriving medical practice and ground it to dust. Defendant Abraham resides at 1 Saxon Lane, Shrewsbury, MA 01545, in this District.

## VENUE

5       Venue is proper because all parties reside in this district.

## JURISDICTION

6       This court has jurisdiction under 28 U.S.C. § 1331 and § 1332. Dr Bock's claims for relief arise under 15 U.S.C. §§ 1–7, Sherman Antitrust Act, and 15 U.S.C. §§ 12-27, Clayton Act.

## TIMELINESS

7       Defendants Sloane and Abraham unlawfully suspended plaintiff's license on October 10,

2

2019 even after SJC Justice Kimberly Budd ruled that they had violated plaintiff's constitutional

rights for many years and defendants filed a stipulation in the SJC on October 8, 2019

undertaking to not molest plaintiff until July 2021. On September 26, 2019, when defendant

Sloane grudgingly conceded that she had to restore plaintiff's license, that same day she

announced that it would be suspended again within two (2) weeks. This complaint is timely.

Clayton and Sherman Act claims are filed within four years.

STANDING

8      Plaintiff has standing to bring suit because he has personally suffered massive damages

due to antitrust actions repeatedly and intentionally directed at him by the named defendants, that

can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 US 555 (1992),

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519

(1983), *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) , *Hanover 3201 Realty, LLC v.*

*Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015) *cert. denied*, 136 S. Ct. 2451 (2016),

cited in *Puerto Rico Telephone v. San Juan Cable*, 874 F.3d 767 (1st Cir. 2017)

9      Plaintiff's former patients also have standing as the injury caused to plaintiff by the

defendants was ultimately intended to injure the patients of Massachusetts and make them pay

$200 month after month until they died, and injuring plaintiff was a necessary step for

defendants to injure the patients, and injury to the patients was inextricably intertwined with the

intended injury to plaintiff. *McCready* supra (antitrust injury "cannot reasonably be restricted to

those competitors whom [defendants] hoped to eliminate from the market")

JOINT AND SEVERAL LIABILITY

10     Pursuant to the Clayton Act, and the Supreme Court's ruling in *Texas Industries v.*

3

*Radcliff*, 451 US 630 (1981), antitrust defendants are jointly and severally liable for statutory treble damages and attorney's fees without a right to contribution.

## PLEADING STANDARDS

11      This antitrust complaint exceeds the standard set in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Even without the benefit of discovery, this complaint is pleaded with particularity to ensure all known facts and written instruments are centrally within the four corners of the complaint and with each defendant's role particularized so as to overcome the defendants' inevitable Rule 12 motion to dismiss in lieu of an honest answer via the intentionally false excuse that the complaint is confused, rambling, and lacking in detail such that the defendants find it very difficult to understand the claims against them. This complaint is supported by affidavit.

## FACTUAL BACKGROUND

### THE LIFETIME SUBSCRIPTION MODEL WAS NOT STATE POLICY IN 2014, AND IS NOT STATE POLICY EVEN NOW

12      For decades, the standard of care, and the official policy of both the United States and Massachusetts, has been to try various non-pharmacological therapies for people who could not stay away from a drug or drugs.

13      This included various psychiatric and psychological interventions and symptom-relief using medicines with no addiction potential (such as Advil, Bentyl, Imodium etc.).

14      Starting with methadone and then with Suboxone, it became recognized that Medication Assisted Treatment (MAT) is associated with good outcomes in many patients.

15      Only very recently has there been any data to suggest that for a ***small subgroup*** of

4

patients within the larger MAT group, it may be beneficial for them to be on a particular opioid-agonist medicine indefinitely - a "lifetime subscription."

16      There is a grand total of one paper in the medical literature, that too from 2021, that considers what it calls The Duration Dilemma in opioid-agonist therapy (how many years can we require patients to just stay on Suboxone?). (https://pubmed.ncbi.nlm.nih.gov/34533830/)

17      Placing opiate addicts on monthly Suboxone prescriptions for the rest of their life is the Lifetime Subscription Model, rather like Gillette razor blades. (https://www.vox.com/the-goods/2018/12/11/18134456/best-razor-gillette-harrys-dollar-shave-club)

18      In 2014, when defendants chose to eliminate plaintiff from the medical marketplace in Massachusetts based solely on his non-adherence to the Lifetime Subscription Model, it was not settled science by a long shot, was not the standard of care in Massachusetts, and most certainly was not a state policy by any stretch.

19      Physicians have even furnished affidavits to federal court declaring that their patients could not be safely maintained on Suboxone and needed to be switched to a different medicine.

20      Recently, in *Pesce v. Coppinger*, Pesce's physician swore that Pesce failed Suboxone and only methadone worked for him.

21      The US District Court for Massachusetts accepted this affidavit. See *Pesce v. Coppinger*, 1:18-CV-11972-DJC (ECF #56).

22      The American Civil Liberties Union brought suit on behalf of Pesce and cites - in support of its claim that the Lifetime Subscription Model is the standard of care - a magazine column published in *Vox* by German Lopez titled "There's a highly successful treatment for opioid addiction. But stigma is holding it back." and subtitled "Medication-assisted treatment is often

5

called the gold standard of addiction care. But much of the country has resisted it." (https://www.aclum.org/en/cases/pesce-v-coppinger)

23    It is axiomatic that if much of the country has resisted MAT, that approach is not the established standard of care across Massachusetts or the rest of the country, and most certainly not a legal standard applicable to any due process proceeding regarding a medical license.

24    The ACLU is at liberty to rely on some claim - "is often called the gold standard" - made in a *Vox* article, to support an argument in a brief, but Defendant Sloane and Defendant Abraham may not make that same claim when summarily suspending the plaintiff's medical license.

25    In *Pesce*, the defendant sheriff presented, and Judge Casper accepted, clear evidence that the United States Department of Health and Human Services had awarded the Middleton Jail $1.5 million to try different treatment modalities other than the Lifetime Subscription Model: "The non-opioid treatment program implemented in Essex County correctional facilities, including Middleton, was recently awarded a three-year, $1.5 million grant from the Department of Health and Human Services Substance Abuse and Mental Health Services Administration. D. 41 at 10." ECF #56, at page 8.

26    In *Pesce*, Judge Casper ruled in the plaintiff's favor because the court accepted that blanket policies and models must give way to individual histories and results - which is precisely how Dr. Bock practiced medicine - with individually-tailored treatment plans.

27    In *Pesce*, Judge Casper agreed with Pesce's physician that treatment approaches must be individually-tailored, with buy-in from individual patients who consciously choose the plan that works for them, and reject other plans, which is precisely what the defendants here oppose, and summarily suspended plaintiff for that specific reason - that he offered his patients individual

6

choices.

28      In *Pesce*, Judge Casper also reiterated an old principle - courts must not determine the

standard of care or treatment decisions: "Where there is a dispute over the "adequacy of the

treatment," federal courts are "reluctant to second guess medical judgments." *Graham ex rel.*

*Estate of Graham v. Cnty. Of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quoting *Westlake v.*

*Lucas*, 537 F.2d 857, 860 (6th Cir. 1976))."

29      In 2017, three years after defendants summarily suspended plaintiff's medical license for

not being loyal to the Lifetime Subscription Model and not coercing that blanket model on all

patients, the United States issued a report enumerating various "policy levers" that state and local

authorities may use to increase treatment and recovery capacity. (https://aspe.hhs.gov/sites/

default/files/migrated_legacy_files//182801/SLlevers.pdf)

30      Nowhere in that report does the United States recommend summary suspensions and

grinding a physician to dust for not forcing his patients to purchase Suboxone month after month

for the rest of their lives.

31      It was only in 2018 that the Commonwealth of Massachusetts established a Medication

Assisted Treatment Commission, through Section 103 of Chapter 208 of the Acts of 2018:

> There shall be a special commission to study and make recommendations regarding the
> use of medication-assisted treatment for opioid use disorder in the commonwealth,
> including methadone, buprenorphine and injectable long- acting naltrexone. (b) The
> commission shall: (i) create aggregate demographic and geographic profiles of
> individuals who use medication- assisted treatment; (ii) examine the availability of and
> barriers to accessing medication-assisted treatment, including federal, state and local laws
> and regulations; (iii) determine the current utilization of, and projected need for,
> medication-assisted treatment in inpatient and outpatient settings, including, but not
> limited to, inpatient and residential substance use treatment facilities, inpatient
> psychiatric settings, pharmacy settings, mobile settings and primary care settings; (iv)
> identify ways to expand access to medication-assisted treatment in both inpatient and

outpatient settings; (v) identify ways to encourage practitioners to seek waivers to administer buprenorphine to treat patients with opioid use disorder; (vi) study the availability of and concurrent use of behavioral health therapy for individuals receiving medication-assisted treatment; and (vii) study other related matters. (https://www.mass.gov/orgs/medication-assisted-treatment-mat-commission)

32     In 2014, when defendants Sloane and Abraham summarily suspended Dr. Bock's medical

license because he was not committed to forcing every single patient of his to purchase

Suboxone month after month for the rest of their lives (and to disregard their individual

responses, circumstances and wishes), and publicly ground his medical practice to dust solely for

this reason, the Lifetime Subscription Model was not the established standard of care or state

policy in Massachusetts.

33     To this day the US Substance Abuse and Mental Health Services Administration does *__not__*

declare that forcing *__all__* patients onto Suboxone indefinitely is mandatory or the standard of care:

"Research shows that a combination of medication and therapy can successfully treat these

disorders, and for some people struggling with addiction, MAT can help sustain recovery."

(https://www.samhsa.gov/medication-assisted-treatment) NB: "*__for some people__*"

34     In 2013, the Federation of State Medical Boards issued model guidelines for medical

boards to use when formulating their own policies regarding the use of buprenorphine (Subutex/

Suboxone) for patients with opioid addiction. (https://www.fsmb.org/siteassets/advocacy/

policies/model-policy-on-data-2000-and-treatment-of-opioid-addiction-in-the-medical-

office.pdf)

35     The Guidelines warned: "Although early reports based on animal studies suggested that

buprenorphine would have a low potential for misuse to achieve euphoria, researchers have

documented a measurable level of misuse and diversion of buprenorphine."

36      In 2015, the Center for Health Information and Analysis, a body created by the Legislature, issued its report on access to addiction treatment in Massachusetts, and did **_not_** declare that the Lifetime Subscription Model is the standard of care or state policy. (https://www.chiamass.gov/assets/Uploads/SUD-REPORT.pdf)

37      In January 2015, the "STANDARD OF CARE" issued by the Massachusetts Department of Public Health's Bureau of Substance Abuse Services declared: "Office based opioid treatment with buprenorphine (OBOT-B) is a primary care model providing evidence based treatment (both detoxification and maintenance) for individuals addicted to opioids." (https://archives.lib.state.ma.us/bitstream/handle/2452/432664/ocn962926357.pdf?sequence=1&isAllowed=y)

38      In the above document, the Commonwealth declared that detoxification was within the standard of care and within state policy.

39      There was absolutely no state policy that defendants can point to that supported their eliminating Dr. Bock from the medical marketplace in 2014 solely because he slowly tapered his addiction patients, with their consent, off Suboxone over 4-6 months (detoxification instead of maintenance).

40      Publicly destroying plaintiff to send a clear message to other physicians, that they better adopt the Lifetime Subscription Model for *all* patients as a blanket policy or else be annihilated from the marketplace, was not within the defendants' authority to do, *per se* violated the Sherman Act, and shall not be cloaked by state sovereign immunity on policy grounds.

41      The defendants also violated the individual choice of patients by eliminating independent physicians from the relevant marketplace in order to ensure a monopoly to practitioners of the

Lifetime Subscription Model.

## ENTRENCHED PATTERN OF RELENTLESS TARGETED DESTRUCTION BASED SOLELY ON PLAINTIFF'S LACK OF FEALTY TO THE LIFETIME SUBSCRIPTION MODEL

42      There is an undeniably stark contrast in the treatment Dr. Bock received at the board prior to defendants Sloane and Abraham capturing power, and after defendants took over the medical board.

43      In 2006, Dr. Bock began a program at his Revere clinic to offer slow detoxification and assisted sobriety to hundreds of patients who wished to stop letting opiate-dependence define their lives.

44      Compared to physicians who simply and quietly rewrote a prescription for Suboxone every month and pocketed the money, Dr. Bock cared, engaged actively with his patients, placed them foremost and worked with them to help achieve their individual goals.

45      Compared to physicians who simply and quietly rewrote a prescription for Suboxone every month and pocketed the money, Dr. Bock had an increased turnover of patients as they dropped out of the program and then returned or moved to a different physician.

46      Thus he saw multiples of patients compared to other physicians who simply kept their patients on Suboxone every month.

47      This increased number of patients was directly proportional to the number of complaints filed with the board by former patients - there were a total of three complaints - of which only one was from a narcotics addict, which was similar to later complaints during the Sloane era.

48      Prior to defendants Sloane and Abraham taking over the board, individual complaints

were investigated fairly and resolved individually.

49      In every case, Dr. Bock submitted documents and video proving that the complaint was false or embellished in bad faith as a result of the complainant's personal frustrations in life, and the board resolved the complaints as unsupportable.

50      This changed dramatically when Sloane installed herself in September 2012 as Chair and then never left until June 2020.

51      As had happened before, in the fall of 2011, a narcotics patient filed a false complaint alleging that Dr. Bock had been rude and assaultive.

52      This time, instead of resolving the complaint as exaggerated and unsustainable based on hard evidence, the board held an in-person meeting with Dr. Bock in which his view on the Lifetime Subscription Model was explored and he was falsely accused of claiming that addiction is not a disease.

53      In order to prove his understanding of all aspects of addiction, Dr. Bock emailed the board a PDF manuscript of his forthcoming book - The Drug Whisperer.

54      On January 22, 2014, defendants Sloane and Abraham caused Dr. Bock's medical license to be summarily suspended on the spot, without any warning to him, under the false claim that because he tapered patients off Suboxone in accordance with their wishes and personal goals, he represented an "immediate and serious threat to the public health, safety, or welfare."

55      On January 22, 2014, defendant Sloane, knowing that state law barred her from signing official documents as Chair on that date, issued a public statement of allegations against Dr. Bock which claimed that the "manner in which the Respondent prescribes Suboxone is below the standard of care" and that Dr. Bock had engaged in disruptive behavior that negatively affected,

11

or had the potential to negatively affect, patient care, in violation of Policy 01-01.

56     Board Policy 01-01 requires actual evidence of patient harm caused by the accused

physician before the board acquires jurisdiction to even bring a public statement of allegations:

> (a) "Behavior by a physician that is disruptive, **and** compromises the quality
> of medical care or patient safety, **could** be grounds for Board discipline."
> (b) "Physicians must recognize that disruptive behavior, **if** it directly impacts patient
> care or safety, **may** reach a threshold for discipline." *emphasis added*

57     The defendants had no evidence for any patient harm but issued allegations under that

Policy anyway, knowing that they had no jurisdiction to even bring charges.

58     As noted above, the manner of Dr. Bock's prescribing - detoxification - was fully within

the standard of care and state policy in Massachusetts, but defendant Sloane issued public

allegations anyway and ground his practice into dust.

59     By law, an emergency hearing on the summary temporary suspension was required to be

held within seven (7) days of the summary suspension, meaning by January 29, 2014.

60     The "emergency suspension hearing" was finally held in early March 2014 and was

conducted on the briefs.

61     In November 2014, fully ten (10) months later, the DALA magistrate applied the wrong

'substantial evidence' standard to the summary suspension order and found that defendant Sloane

did have probable cause to summarily suspend Dr. Bock's medical license before holding a

hearing on the merits - in glaring contempt for Dr. Bock's human and due process rights.

62     Dr. Bock's medical license remained summarily suspended throughout those months.

63     On June 9, 2015, SJC Justice Cordy ruled in a different case that substantial evidence was

the wrong evidentiary standard when evaluating the board's summary suspension of a

physician's medical license and that reviews of summary suspensions must employ the preponderance of evidence standard. *Randall v. Board of Registration in Medicine*, SJ-2014-0475, Memorandum and Judgment, June 9, 2015

64      Defendants Sloane and Abraham did *not* inform Dr. Bock of this massive change in the law that would immediately affect his due process rights and did not hold a rehearing on the summary suspension under the correct evidentiary standard.

65      Dr. Bock's license remained summarily suspended while he waited for a hearing on the merits, while he remained unaware of the massive implications of Justice Cordy's ruling.

66      This hearing on the merits took place only in 2018, fully four (4) years into a summary "temporary" suspension, and without a rehearing under the correct evidentiary standard.

67      At the 2018 hearing, the defendants initially did not produce a single patient to testify and finally produced one after the DALA magistrate extended the time for evidence to help the defendants.

68      The defendants' expert did not review one single patient chart.

69      Below is a portion of the verbatim transcript of the testimony from the expert presented by defendants to testify against plaintiff at the 2018 administrative law hearing on the 4-year long summary suspension of his medical license.

70      The defendants' expert - Dr. Olivera Bogunovic-Sotelo - is an addiction psychiatrist who graduated from the University of Belgrade in Serbia, trained at the State University of New York - Brooklyn, presently works as a psychiatrist at McLean's Hospital in Belmont, Massachusetts, and testified that she prescribes Suboxone to patients (but plaintiff finds she is not listed by SAMHSA as a Suboxone doctor in Massachusetts).

13

71    The official transcript documents that defendants did not ask their expert to review a

single medical chart for a single patient and that their action was based solely on plaintiff's non-

adherence to the Lifetime Subscription Model.

72    At the DALA hearing, Mr. Stephen Hoctor represented the defendants against Dr. Bock,

and presented the expert as their witness.

_____

DALA Hearing before Magistrate Kenneth Forton, Docket No. RM 2014-16,
March 20, 2018 (11:39 a.m. - 1:02 p.m.)
Direct Testimony

MR. HOCTOR. You were asked to review some things in this case?

DR. BOGUNOVIC-SOTELO. Sure.

Q. Do you recall what materials you reviewed?

A. I've reviewed the synopsis of Doctor Bock's book as well as the video statements that were
included as well.

Q. The YouTube videos?

A. Yeah, the YouTube videos.

Q. You said you reviewed his manuscript?

A. Yes.

Q. The Drug Whisperer?

A. I'm sorry?

Q. It's called The Drug Whisperer?

A. Yes, the manuscript titled The Drug Whisperer.

THE MAGISTRATE: Is that the same thing as the synopsis of the book?

THE WITNESS: Yes.

BY MR. HOCTOR:

14

Q. Did you review any other material?

A. The disclosure and agreement as well.

Q. Can you describe Doctor Bock's Suboxone program?

THE MAGISTRATE: Sorry, did you review any medical records from Doctor Bock?

THE WITNESS: No, I did not review the medical records. I reviewed only what was stated previously.

THE MAGISTRATE: Okay.

MR. HOCTOR:

Q. Were you asked to review the medical records?

A. No.

_____

73      It is undeniable that defendants aimed (and did succeed) to repeatedly suspend plaintiff's medical license and ability to earn a living in his chosen profession, in the documented absence of any harm to even one single patient, and based solely on his refusal to force his patients to purchase Suboxone month after month indefinitely.

74      There was ***not one single patient*** who overdosed and died after being tapered off Suboxone by Dr. Bock and so the defendants did not even allege that as the reason for a summary suspension.

75      It is undeniable that defendants did not want plaintiff to continue practicing medicine as he chose to - within the Massachusetts standard of care and state policy, and without any documented harm to any of his patients - solely because he served as an example to other physicians in the Massachusetts marketplace who were also not quite convinced that making patients stay on Suboxone indefinitely and come by once a month and pay $200 for a new

15

prescription was the right thing for an ethical physician to do.

76     This conclusion is reinforced by plaintiff becoming prominent on YouTube where his philosophy was accessible to thousands of patients, their families and other physicians.

77     It is more than plausible that had plaintiff been just a physician at one clinic in Revere practicing medicine according to his conscience and within the standard of care, he would not have been driven out of practice repeatedly by the defendants for his dissenting view on the Lifetime Subscription Model.

78     Plaintiff's significant presence on YouTube however elevated him in the defendants' eyes to the level of a significant threat to their Lifetime Subscription Model that they felt compelled to eliminate.

79     After all, it wouldn't do for patients to have access to different choices and not be coerced into receiving care from only supporters of the Lifetime Subscription Model.

80     In addition, plaintiff sent a copy of his book - The Drug Whisperer - in manuscript form to the defendants, in a good faith effort to show that his approach was fully within the standard of care and established customs and mores within the physician community in Massachusetts and compliant with state policy.

81     Plaintiff had not understood the defendants' aim at the time and had made the fatal error of assuming that the defendants were also physicians who were committed in good faith to the practice of medicine within the standard of care, and not that they were committed only to abusing their power to destroy physicians who did not adopt the Lifetime Subscription Model, and create a monopoly where only the Lifetime Subscription Model was available to patients.

82     As documented by the transcript above, this manuscript served as the sole basis for the

16

defendants' prosecution of plaintiff, and was the sole exhibit used by their expert to declare that plaintiff represents a danger to public safety, in the documented absence of harm to even one single patient.

83      It is undeniable that defendants declared that plaintiff must be destroyed and excluded from the medical marketplace and interstate commerce based solely on his publicly-expressed ideas and not on objective evidence of patient harm or violation of state policy.

84      Defendants lacked the authority to pick winners and losers in the marketplace of ideas and create a monopoly in favor of the Lifetime Subscription Model, given the undeniable evidence that detoxification remains within state policy and the standard of care to this day, and that detoxification is integral to identifying *the small percentage* of opiate addicts who absolutely need lifelong treatment with an opioid-agonist medicine in order to live stably.

85      It is vital to note that the DALA hearing occurred in 2018 on a docket dated 2014.

86      Defendants kept Dr. Bock's license suspended from 2014 through 2018 even though they had already received a ruling in 2015 from Justice Cordy at the Supreme Judicial Court that the defendants were using the wrong evidentiary standard to summarily suspend physicians' licenses. *Randall v. Board of Registration in Medicine*, SJ-2014-0475, Memorandum and Judgment, June 9, 2015.

87      Justice Cordy ruled that a *summary suspension* of a physician's medical license **must** be based on the preponderance of evidence standard, not merely substantial evidence, and ordered the board to retry Dr. Randall's suspension hearing under the correct standard.

88      Defendants never informed plaintiff that the SJC had so ruled and that it applied to his own due process rights, and never offered in 2015 to retry Dr. Bock's suspension hearing under

17

the correct standard, because it would have disrupted their concerted effort to destroy plaintiff as an example to others of what would happen to any physician who did not commit to the Lifetime Subscription Model, and thus increasing the pool of patients purchasing Suboxone for life.

89      Defendants let plaintiff remain suspended for four (4) years while they deliberately and coldly dragged out the administrative process.

90      On July 16, 2018, DALA Magistrate Forton issued his recommended decision and declared that the defendants had *failed* to prove that Dr. Bock's addiction treatment program (and Suboxone detoxification) fell below the standard of care, and that Dr. Bock did not violate the Disruptive Behavior Policy 01-01 either - meaning *total, complete, vindication / exoneration*, after being forced by the defendants to sit at home for four (4) YEARS with no income and having lost all his patients.

91      Even after plaintiff's Suboxone prescribing was declared to be within the standard of care, and the magistrate recommended that the suspension be vacated, defendants Sloane and Abraham willfully and consciously chose to claim that Dr. Bock must perforce revive a lapsed license instead, in an intentional effort to keep plaintiff from practicing.

92      We have the actual transcript in which both defendants **openly admit** that despite the exoneration at the hearing on the merits, they had intentionally used the lapsed license pretext to continue blocking Dr. Bock from earning a living as a physician. See *infra*

93      Plaintiff finally sought relief from the SJC, at the cost of $30,000 to himself, through a petition for a writ of certiorari.

94      On September 4, 2019, Justice Kimberly Budd ruled in his favor, declared that the defendants' actions were arbitrary and violated due process, and reported the petition to the full

18

bench for a precedential, public, binding full opinion after public oral argument. *Bock v. Board of Registration in Medicine*, SJ-2019-0210

95      On October 11, 2019, solely to avoid a binding precedential opinion after public oral argument, defendants Sloane and Abraham filed a stipulation with the full bench promising that they would immediately "revive" Dr. Bock's "medical license under the same terms as such license was issued prior to the Order of Temporary Suspension dated January 22, 2014, and with a current renewal date of July 23, 2021."

96      Unfortunately, plaintiff's then-counsel did not insist on a precedential ruling from the full bench that would also benefit other physicians in the form of authority that they could cite.

97      And the defendants did return Dr. Bock's license to him, and told him to not get used to the idea of being licensed as they were going to suspend it again.

98      The defendants then summarily suspended Dr. Bock's license again, after two (2) DAYS.

99      Defendant Chair Candace Sloane played the controlling role, and Abraham fully supported Sloane.

100     The transcript of Sloane's statements to other Members makes clear that she did not accept that when an SJC Justice (now the Chief Justice) ruled that a physician's due process rights had been violated by her, and that acquittal by the DALA magistrate meant that he had been ***innocent*** all along, that she was required to regard the physician as an innocent who had been wrongly accused.

101     Even when a physician was vindicated by the SJC - not a common event by any stretch - and the defendants agreed to restore his license solely to prevent a public stink and binding precedent, defendant Sloane immediately declared that the physician was a guilty person who

had "gotten away," and set about finding another pretext to suspend his license again.

102     Here is defendant Sloane describing Dr. Bock to the Members after signing the Joint Stipulation in 2019 that agreed to restore a license wrongly suspended in 2014 and left suspended until 2019:

> "*And that is why it isn't that he's become a serious threat, he always was, but it was protected because he had a lapsed license. Now we have lost the lapsed license because of the Single Justice perspective, and for that reason he is a serious threat that we need to deal with right now. And that is why we are being advised by staff to do a Summary Suspension Type B.*" page 17, Transcript, September 2019

> Translated into educated English: "*And that is why it isn't that he's become a serious threat only after DALA exonerated him and ordered the summary suspension vacated, he always was a serious threat, but the Lifetime Subscription Model was protected because we could falsely claim through our unconstitutional Lapsed License Policy that his license could not simply be restored and that he needed to apply to revive a lapsed license and we could then drag that out for years and continue grinding his life to dust. Now that we have lost the use of the Lapsed License pretext, thanks to the Single Justice's perspective on constitutional protections, because we were forced to stipulate to the SJC that yes we would immediately restore his license, he is a serious threat that we need to deal with right now. And that is why we are being advised by staff to do a Summary Suspension Type B.*"

103     To defendant Sloane it does not matter that Dr. Bock has been exonerated on the merits every single time, and again vindicated by Justice Kimberly Budd on constitutional grounds!

104    Sloane openly admitted that the lapsed license issue was a pretext that she had intentionally used against Dr. Bock even after he was exonerated by the DALA magistrate (*we lost the use of the lapsed license excuse! Fie on the SJC!*).

105    Dr. Bock had just been exonerated after having his entire practice ground to dust, and yet Sloane saw only the "threat" of Dr. Bock's practice and YouTube videos showing other physicians that detoxification into sobriety was within state policy and the standard of care for both DPH and the medical community.

106    Defendant Abraham, Vice-Chair at the time and later Chair, responded to Chair Sloane's above declaration:

> "*So, Madame Chair, yes, you articulated it very well and so I'm going to add that Dr. Bock has always remained a serious threat for the reasons you just mentioned.*"

107    What Abraham meant is that SJC Justice Budd was responsible for not eliminating a "serious threat" because she cared about the US Constitution and due process more than making an example of a physician who was not committed to the Lifelong Subscription Model.

108    It is impossible to overstate the perniciousness of defendants' view.

109    Sloane and Abraham perceived Justice Budd's ruling as a "loss" and nothing more.

110    And to make good on the loss in the Single Justice Court, defendants Sloane and Abraham suspended Dr. Bock's license again, ***just two (2) days after*** swearing in writing to the full SJC that they would not destroy his livelihood until July 23, 2021.

111    This October 2019 suspension again intentionally violated the Sherman Act, was aimed solely at eliminating a competing idea or practice from the marketplace in order to coerce patients into receiving care from only supporters of the Lifetime Subscription Model, and was

21

not in pursuit of established state standards or any established reasonable state policy that merited sovereign immunity.

112    In 2019 itself, DALA Chief Magistrate Edward McGrath ruled at the emergency second suspension hearing that this 2019 suspension failed to meet the preponderance of evidence standard and ordered defendants to restore Dr. Bock's license to active status pending a hearing on the merits.

113    And in 2020, Chief Magistrate McGrath issued a stinging recommended decision that completely exonerated Dr. Bock again and declared that Dr. Bock had not committed any misconduct in the practice of medicine under the legal standard set by the SJC back in 1989, meaning the *defendants were fully aware of this standard* when they issued their consciously false public allegations against Dr. Bock in order to grind his practice to dust.

> "Under *Hellman v. Board of Registration in Medicine*, 408 Mass. 800
> (1989), "misconduct" means "willed and intentional...wrongdoing," to
> exclude an "error of judgment or lack of diligence." *Id.* at 804. *Hellman*'s
> definition of "misconduct" remains good law."

114    Defendant Sloane left the Board in 2020, defendant Abraham left the Board in spring 2021, and Dr. Bock is no longer being persecuted though his views remain the same as in 2014, though he has been unable to revive his addiction practice and remains out of that marketplace.

## DEFENDANTS SUBORNED THEIR EXPERT'S PERJURY
## EVEN THOUGH SHE HERSELF TAPERS PATIENTS OFF BENZODIAZEPINES

115    Defendants' expert - Dr. Olivera Bogunovic-Sotelo - committed perjury when she sold the DALA magistrate the defendants' false claim that Dr. Bock's lack of fealty, in 2014, to the Lifetime Subscription Model, violated the standard of care.

116    Defendants suborned her perjury to claim that Dr. Bock tapering his opiate addicts off drugs was associated with such a tremendously increased risk of overdose deaths that he was an immediate and serious threat to public safety.

117    Defendants did so even though they knew their own expert routinely tapers her addiction patients off benzodiazepines, a process which has a known high risk of causing seizures and deaths.

118    After defendants' expert waxed eloquent on how addicts have physical brain changes and thus must be maintained on their drug of choice for life, we have this:

Q. Okay. With respect to your outpatient benzodiazepine program, can you describe your approach in general terms? For example -- well, what would be the first steps that you would take in counseling or eliciting information or whatever in this program?

A. In this program? A full history of treatment, a full history of why somebody -- what were the successes, what were the problems with treatment. The benzodiazepine outpatient program is a very small program with a lot of exclusion criteria because it's very difficult to detoxify patients who are struggling with benzodiazepines especially because of the risk of seizures. So a lot of history is elicited from the patients including family support and other -- there are certain requirements to enter into the program, so not everybody is actually eligible to be tapered on an outpatient basis specifically with benzodiazepines.

Q. Okay. Am I correct that you are trying to -- basically the main object of your program is gradual detoxification or am I wrong on that?

A. For patients who are entering this particular program and want to taper off and are candidates for taper, because certain patients are not candidates for taper they do enter the program. So it's not only -- it's based on patients' willingness to do it as well as, as I said, it's a very small program and it's an attempt to taper off. But if patients are not able to tolerate the taper they are then referred for maintenance treatment.

119    It is to the DALA magistrate's credit that he was able to see through the defendants'

conscious perfidy and rule that Dr. Bock had not violated the standard of care, despite the

defendants implying that the White House supported the Lifetime Subscription Model while

misdirecting the magistrate with the straw man argument that Dr. Bock did not believe that

addiction is a chronic disease, which was not the allegation issued against Dr. Bock. The

allegation dealt only with Dr. Bock tapering his patients off Suboxone after 4-6 months if they

chose detoxification and sobriety.

> THE MAGISTRATE: But when you call it a "model," does this mean that this is like a
> working hypothesis?
> THE WITNESS: No, it's not a working hypothesis, it is a brain disease by definition. This
> has been supported by the National Institute of Drug and Alcohol Abuse. And Nora
> Volkow who is the director of the NIDA has done significant research to prove that it is a
> disease, a chronic disease.
> THE MAGISTRATE: What is that organization? Like, who are those people? It sounds
> really official but I have no idea who they are.
> THE WITNESS: So they are a group of addiction psychiatrists. Nora Volkow actually
> was part of the White House consultant in addressing the issues and she is a major
> researcher in the field of addiction psychiatry. So people who -- part of the National
> Institute of Drug and Alcohol Abuse, there are lot of experts in the field of addiction
> psychiatry who are either working there or consultants for the NIDA.
> THE MAGISTRATE: And so, like, does the AMA consider it a disease?
> THE WITNESS: Yes, the American Medical Association also considers it as a disease.
> THE MAGISTRATE: Okay. Are there any boards or organizations that don't consider it a
> disease that you're aware of?
> THE WITNESS: Not any reputable organizations that I'm aware of.
> THE MAGISTRATE: That's a cheeky way to respond. Are there any disreputable

organizations in your opinion?

THE WITNESS: Well, there is basically -- there have been always a question and there are questions about, you know, contesting the fact that addiction is a disease but not supporting fully, that I am aware of, that are supporting the model that addiction is not a disease.

120    Defendants' expert was forced to cite anecdote, personality, and name-drop because she was unable to cite hard science, and had zero evidence regarding Dr. Bock's patients.

121    Mrs. Henry Lafayette Dubose, an important character in Harper Lee's "To Kill A Mockingbird," is a patient who slowly weaned herself off opiates so that she would be drug-free when she finally passed away, and her physician of course worked with her to help her achieve her personal goal. (https://www.amjmed.com/article/S0002-9343(13)00768-7/pdf)

122    Defendants Sloane and Abraham would have destroyed Mrs. Dubose's physician had they been able to.

### DEFENDANTS' PUBLIC STATEMENTS LED DIRECTLY TO PATIENTS SUING THE PLAINTIFF

123    In 2012, plaintiff had created his YouTube channel and posted testimonial videos of his patients talking straight into the camera about their thoughts, aspirations, goals, in order to inspire and support other patients facing the same issues.

124    Plaintiff had composed, with an attorney's help, consent forms that 133 patients signed prior to volunteering to speaking into a video camera in order to help other patients.

125    On January 22, 2014, defendant Sloane and defendant Abraham issued a public statement of allegations claiming that plaintiff's care of his Suboxone patients was below the standard of care.

126    On November 6, 2014, lawyers filed a lawsuit against plaintiff based on this statement of

allegations and claimed that the video of their plaintiff, Jane Doe, was posted online against her

will, despite a signed consent form, despite the patient asking to be filmed, and no damages.

127    Dr. Bock's attorneys litigated his defense as they considered his defense to be meritorious

and the claims false.

128    In 2017, the plaintiff's lawyers succeeded in expanding the lawsuit into a class action and

added 65 other patients.

129    At that point the insurance company settled the case for $3 million for 66 plaintiffs.

130    These patients had in reality no complaints by themselves about the testimonial videos

and had signed full releases, and the case would not have been filed but for defendants marking

Dr. Bock out as a public target and easy money.

<u>LAW BACKGROUND</u>

THE BOARD OF REGISTRATION IN MEDICINE IS NOT AN EXECUTIVE AGENCY
AND NOT AN ARM OF THE COMMONWEALTH

131    At all times relevant to this complaint, defendant Candace Sloane was the Chair and

defendant Abraham was the Vice Chair of the Board of Registration in Medicine.

132    The board is not a party to this case, but it is important however for the court to

understand what the board is not.

133    In 1979, the Legislature passed the present board's enabling statute - MGL ch. 13 § 10 -

"There shall be a board of registration in medicine, in this section and section eleven called the
board, **consisting of seven persons** appointed by the governor, who shall be residents of the
commonwealth, **five of whom shall be physicians** registered under section two of chapter one
hundred and twelve, or corresponding provisions of earlier laws, and two of whom shall be
representatives of the public, subject to the provisions of section nine B. Each member of the
board shall serve for a term of three years.

The board shall adopt, amend, and rescind such rules and regulations as it deems necessary to carry out the provisions of this chapter; **may appoint legal counsel and such assistants as may be required**; may make contracts and arrangements for the performance of administrative and similar services required, or appropriate, in the performance of the duties of the board; and may adopt and publish rules of procedure and other regulations not inconsistent with other provisions of the General Laws." emphasis added

134    In addition to ensuring that there is no board outside of those seven persons, the

legislature ensured this 7-member board is ___NOT___ under active supervision by the Commonwealth

by passing MGL ch.112 § 1:

"The commissioner of public health shall ___supervise___ the work of the board of registration in nursing, the board of registration in pharmacy, the board of registration of physician assistants, the board of registration of perfusionists, the board of registration of nursing home administrators, the board of registration in dentistry and the board of registration of respiratory therapists. He shall recommend changes in the methods of conducting examinations and transacting business, and shall make such reports to the governor as he may require or the director may deem expedient. The commissioner of public health shall ___consult___ with the chair of the board of registration in ___medicine___ concerning the operations of the board." emphasis added

135    Going by the plain text of MGL ch.112 § 1 it is undeniable that no court may legitimately

claim that ___supervise___ and ___consult___ mean the same thing and that of course the medical board is still

under the active supervision of the executive branch of this Commonwealth. The maxim of

negative implication teaches "that the express inclusion of one thing implies the exclusion of

another." *Commonwealth v. Montarvo*, 486 Mass. 535 (2020)

136    This point of law is important because of the US Supreme Court's decision regarding

*Parker* immunity for market participants serving on occupational licensing boards:

"The similarities between agencies controlled by active market participants and private trade associations are not eliminated simply because the former are given a formal designation by the State, vested with a measure of government power, and required to follow some procedural rules."
*North Carolina Board of Dental Examiners v. FTC*, 574 U.S. 494 (2015)("*NC Dental*")

27

137    The Governor of Massachusetts, Charles Baker, has publicly acknowledged this fact and sought changes in the law by the Legislature.

138    In 2016, Governor Baker introduced a bill to update state law to provide active state supervision over the medical board. It did not pass.

139    In his April 2016 filing letter, Gov. Baker acknowledged that in the absence of his proposed Act, the "current statutory scheme governing the Commonwealth's many independent licensing boards does not provide for the degree of supervision required by the Supreme Court[]" and that "[i]t would also leave individual practitioners who serve as unpaid members on these boards subject to personal legal liability under the antitrust laws." (http://www.mass.gov/governor/legislationexecorder/legislation/state-oversight-of-professional-licensing-boards.html)

140    In 2016 Governor Baker issued Executive Order 567 to introduce *active* supervision of those licensing boards that were statutorily under his supervision. (https://www.mass.gov/executive-orders/no-567-to-ensure-proper-review-of-the-regulation-of-professional-licensing-by)

141    Because the Legislature refused to amend MGL ch.112 § 1 - which mandates that the medical board is unlike all other occupational licensing boards and is *__not__* under the supervision of the Commonwealth - Executive Order 567 cannot and has never applied to the medical board.



DENTISTRY   MEDICINE   NURSING   PHARMACY
(One of these is not like the others)

142    The Governor of the Commonwealth of Massachusetts is already on the official record

that there is no active supervision of the medical board by the state, and so no *Parker* immunity.

143    As a matter of law, because of the Legislature's conscious choices in 1979 and again in

2016, the Massachusetts Board of Registration in Medicine remains a private trade association as

defined by Justice Ginsburg in *NC Dental* and is **not** an arm of the Commonwealth. See *NC*

*Dental*, supra, *Fernald v. Governor*, 471 Mass. 520 (2015), *Hoover v. Ronwin*, 466 US 558

(1984)

"The authoritative statement is the statutory text." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546, 568 (2005) "A fundamental tenet of statutory interpretation is that statutory
language should be given effect consistent with its plain meaning and in light of the aim of the
Legislature unless to do so would achieve an illogical result." *Sullivan v. Brookline*, 435 Mass.
353, 360 (2001) "Sometimes, however, states structure these entities to operate at such a remove
from the state government that they are not properly understood to be arms of the state. When
states set up such entities in that way, they are not entitled to share in the state's immunity."
*Grajales v. Puerto Rico Ports Authority*, 831 F.3d 11 (1st Cir. 2016)

"With respect to the Eleventh Amendment issue, it appears undisputed that the MBTA was not
entitled to immunity as an "arm of the state" prior to 2009. Although the MBTA has pointed to
various changes regarding its structure and governance in 2009, 2012, and 2015,  applying the
two-step analysis set forth in *Grajales v. Puerto Rico Ports Authority*, 831 F.3d 11 (1st Cir.
2016), and *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico & Caribbean
Cardiovascular Center Corp.*, 322 F.3d 56 (1st Cir. 2003), I am not persuaded that those changes
were sufficient in kind or degree now to qualify it as an arm of the Commonwealth. Significantly
the MBTA's enabling statute continues to describe it as "a body politic and corporate, and a
political subdivision of the commonwealth." Mass. Gen. Laws ch. 161A, § 2; see also Mass.
Gen. Laws ch. 6C, § 1 (defining Department of Transportation as a "state agenc[y]" but defining
the MBTA and others as "[i]ndependent agencies")." "I am not persuaded that the recent
legislative actions have had the effect of converting the MBTA from an independent "body
politic and corporate, and a political subdivision of the commonwealth" into an arm of the
Commonwealth. See *Grajales*, 831 F.3d at 17–18; *Fresenius*, 322 F.3d at 65, 68. Furthermore,
those changes do not appear to have the effect of making the Commonwealth legally or

practically liable for any judgment against the MBTA in this action so as to permit the MBTA to claim the Commonwealth's immunity. See *Grajales*, 831 F.3d at 18; *Fresenius*, 322 F.3d at 65, 68." *Holmes v. Garvey*, Case 1:15-cv-13196-GAO, D.Mass. (2017)

"We interpret this language according to its " 'ordinary, contemporary, common meaning.' " *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); see also *New Prime Inc. v. Oliveira*, 586 U. S. ___, ___–___ (2019) (slip op., at 6–7). To discern that ordinary meaning, those words " 'must be read' " and interpreted " 'in their context,' " not in isolation. *Parker Drilling Management Services, Ltd. v. Newton*, 587 U. S. ___, ___ (2019) (slip op., at 5) (quoting *Roberts v. Sea-Land Services, Inc.*, 566 U.S. 93, 101 (2012))." *Southwest Airlines Co. v. Saxon*, 596 U.S. ___ (2022)

Also see *Pereira v. Sessions*, 585 U.S. ____ (2018) ("Unable to root its reading in the statutory text, the Government and dissent raise a number of practical concerns, but those concerns are meritless and do not justify departing from the statute's clear text."), ""Where the language of a statute is clear and unambiguous, it is conclusive as to legislative intent". *Worcester v. College Hill Props., LLC*, 465 Mass. 134, 138 (2013). In such circumstances, "the sole function of the courts is to enforce [the statute] according to its terms."" *Commonwealth v. Soto*, 476 Mass. 436, 438 (2017)

144   No member of this private trade association, which as no legal existence outside of those seven members, is cloaked by sovereign immunity for actions that violate the Sherman Act.

## DEFENDANTS SHALL NOT BE CLOAKED
## BY STATE-ACTION OR *IPSO FACTO* IMMUNITY

145   Despite Governor Baker honestly placing on the record the undeniable fact that the medical board is an independent licensing board that is not under active supervision by the state and thus its members are liable to private antitrust claims, - despite the plain text of the medical board's enabling statute, and despite the dictate of traditional rules of statutory interpretation - members of this board have repeatedly claimed that the board of course is an executive agency and of course the board is an arm of the Commonwealth and of course they are fully covered by

sovereign immunity for violating federal antitrust law and other laws.

146     Firstly, the market actors always cite as authority a 1979 decision which applied to a previous medical board with a different enabling statute and a different name, that was fully replaced by the current medical board in 1979, 43 years ago already. *Levy v. Board of Registration and Discipline in Medicine*, 378 Mass. 519 (1979) BORADIM ≠ BORIM.

147     Next, the market actors on this independent licensing board cite an ancient US First Circuit decision from 1990 that was bad law by 11 years already at that point because it failed to properly interpret the plain text of the current medical board's 1979 enabling statute and baldly declared that of course the board members are covered by sovereign immunity. *Bettencourt v. Board of Registration in Medicine*, 904 F2d 772 (1990)

148     The market actors have clutched to *Bettencourt* as if their bank accounts depend on it.

149     The Governor's Executive Order 567 could not be more clear in recognizing that the medical board is statutorily excluded from the state's active supervision, and public record requests reveal that the medical board has never been asked to submit any decision for approval by the state under EO567 and has never received any approval by the state.

150     In 2021, Governor Baker tried again to pass legislation that would satisfy the "active supervision" requirement, but even this bill would not enforce any sort of active supervision over the *medical* board because state law plainly *prohibits* the Governor from actively supervising the *medical* board. (https://www.mass.gov/news/baker-polito-administration-files-legislation-to-enhance-public-safety-strengthen-oversight-at-division-of-professional-licensure)

151     Through a plain statute, the Legislature has ensured that the state has delegated control over the medical marketplace and the profession of medicine to a nonsovereign licensing board

sovereign immunity for violating federal antitrust law and other laws.

146    Firstly, the market actors always cite as authority a 1979 decision which applied to a

previous medical board with a different enabling statute and a different name, that was fully

replaced by the current medical board in 1979, 43 years ago already. *Levy v. Board of*

*Registration and Discipline in Medicine*, 378 Mass. 519 (1979) BORADIM ≠ BORIM.

147    Next, the market actors on this independent licensing board cite an ancient US First

Circuit decision from 1990 that was bad law by 11 years already at that point because it failed to

properly interpret the plain text of the current medical board's 1979 enabling statute and baldly

declared that of course the board members are covered by sovereign immunity. *Bettencourt v.*

*Board of Registration in Medicine*, 904 F2d 772 (1990)

148    The market actors have clutched to *Bettencourt* as if their bank accounts depend on it.

149    The Governor's Executive Order 567 could not be more clear in recognizing that the

medical board is statutorily excluded from the state's active supervision, and public record

requests reveal that the medical board has never been asked to submit any decision for approval

by the state under EO567 and has never received any approval by the state.

150    In 2021, Governor Baker tried again to pass legislation that would satisfy the "active

supervision" requirement, but even this bill would not enforce any sort of active supervision over

the *medical* board because state law plainly ***prohibits*** the Governor from actively supervising the

*medical* board. (https://www.mass.gov/news/baker-polito-administration-files-legislation-to-

enhance-public-safety-strengthen-oversight-at-division-of-professional-licensure)

151    Through a plain statute, the Legislature has ensured that the state has delegated control

over the medical marketplace and the profession of medicine to a nonsovereign licensing board

controlled solely by physicians, which is how it should be.

152    In *NC Dental*, the Supreme Court laid down clear guidelines to analyze whether or not

the defendants here may avail of *Parker* immunity.

153    The Court then applied those guidelines to the North Carolina dental board and held:

> "Because a controlling number of the Board's decisionmakers are active market
> participants in the occupation the Board regulates, the Board can invoke state-action
> antitrust immunity only if it was subject to active supervision by the State, and here that
> requirement is not met."
>
> "A nonsovereign actor controlled by active market participants—such as the Board—
> enjoys *Parker* immunity only if " 'the challenged restraint . . . [is] clearly articulated and
> affirmatively expressed as state policy,' and . . . 'the policy . . . [is] actively supervised
> by the State.' " *FTC v. Phoebe Putney Health System, Inc.*, 568 U. S. ___, ___ (quoting
> *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U. S. 97, 105).
> Here, the Board did not receive active supervision of its anticompetitive conduct."
>
> "An entity may not invoke Parker immunity unless its actions are an exercise of the
> State's sovereign power. See *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U. S. 365,
> 374. Thus, where a State delegates control over a market to a nonsovereign actor the
> Sherman Act confers immunity only if the State accepts political accountability for the
> anticompetitive conduct it permits and controls. Limits on state-action immunity are most
> essential when a State seeks to delegate its regulatory power to active market
> participants, for dual allegiances are not always apparent to an actor and prohibitions
> against anticompetitive self-regulation by active market participants are an axiom of
> federal antitrust policy. Accordingly, *Parker* immunity requires that the anticompetitive
> conduct of nonsovereign actors, especially those authorized by the State to regulate their
> own profession, result from procedures that suffice to make it the State's own. *Midcal*'s
> two-part test provides a proper analytical framework to re- solve the ultimate question
> whether an anticompetitive policy is in- deed the policy of a State. The first requirement
> —clear articulation—rarely will achieve that goal by itself, for entities purporting to act
> under state authority might diverge from the State's considered definition of the public
> good and engage in private self-dealing. The second *Midcal* requirement—active
> supervision—seeks to avoid this harm by requiring the State to review and approve
> interstitial policies made by the entity claiming immunity."

154    That same requirement cannot be met by the two defendants in this case.

155    The nonsovereign medical board which they controlled is not under active supervision by

the state as a matter of law, no state policy supports banning detoxification of opiate addicts, and

the state did not review and approve the elimination of plaintiff from interstate commerce simply

for offering detoxification.

156    Eliminating plaintiff from the medical marketplace and interstate commerce because he

offered detoxification was not in the pursuit of any reasonable state policy, because state policy

officially supports detoxification, to this day.

157    No court that complies with US Supreme Court precedent and standard rules of statutory

interpretation can legitimately claim that the two defendants here are covered by state-action

immunity for their violation of federal antitrust law, or that because simply everybody has

always treated the medical board as of course being a sovereign executive agency makes it so:

> "The Board's argument that entities designated by the States as agencies are exempt from
> *Midcal*'s second requirement cannot be reconciled with the Court's repeated conclusion
> that the need for supervision turns not on the formal designation given by States to regu-
> lators but on the risk that active market participants will pursue private interests in
> restraining trade." "The similarities between agencies controlled by active market partici-
> pants and such associations are not eliminated simply because the former are given a
> formal designation by the State, vested with a measure of government power, and
> required to follow some procedural rules." *North Carolina Board of Dental Examiners v.*
> *FTC*, 574 U.S. 494 (2015)("*NC Dental*")

158    The defendants do not qualify for *ipso facto* immunity either.

159    Even if a court were to again defy the binding ruling in *North Carolina Board of Dental*

*Examiners v. FTC*, 574 U.S. 494 (2015), and again baldly claim that of course the medical board

is a state agency, the defendants still do not qualify for *ipso facto* immunity.

> "State agencies are not simply by their governmental character sovereign actors for
> purposes of state-action immunity. See *Goldfarb v. Virginia State Bar*, 421 U. S. 773,
> 791 (1975) ("The fact that the State Bar is a state agency for some limited purposes does
> not create an antitrust shield that allows it to foster anticompetitive practices for the
> benefit of its members"). Immunity for state agencies, therefore, requires more than a
> mere facade of state involvement, for it is necessary in light of *Parker*'s rationale to
> ensure the States accept political accountability for anticompetitive conduct they permit

and control. See *Ticor*, 504 U. S., at 636. Limits on state-action immunity are most essential when the State seeks to delegate its regulatory power to active market participants, for established ethical standards may blend with private anticompetitive motives in a way difficult even for market participants to discern. Dual allegiances are not always apparent to an actor. In consequence, active market participants cannot be allowed to regulate their own markets free from antitrust accountability." *NC Dental*

160    The Supreme Court has applied *ipso facto* state-action immunity in only limited cases—

to the actions of a "state legislature adopt[ing] legislation" or "a decision of a state supreme

court, acting legislatively rather than judicially" and only where the conduct challenged "was in

reality that of" the sovereign itself. *Hoover v. Ronwin*, 466 US 558 (1984)

161    Eliminating plaintiff from interstate commerce and the medical marketplace because he

offered detoxification was ***not*** conduct that was in reality that of the sovereign itself, and was not

an action by the state Legislature or the SJC.

## STATUTORY REGULATION OF THE BOARD CHAIR

162    MGL ch. 10 § 13 includes: "The board shall elect from its members a chairman, vice-

chairman and secretary who shall serve for one year and until their successors are appointed and

qualified."

163    That this private trade association is not under active supervision by the Commonwealth

is also easily demonstrated by the fact that defendant Sloane occupied the post of Board Chair

continuously, nonstop, from September 2012 through June 2020.

164    The statute imposes a one-year term limit to the post of Chair, meaning every year the

post must rotate amongst the seven appointed Members. One may regain the post of Chair only

after a minimum one year break.

165    Because the medical board is a nonsovereign private trade association, no mechanism

exists to enforce term limits and no checks and balances exist to block a Chair from simply

continuing as Chair for nine years straight, as demonstrated by defendant Sloane.

166    And it wasn't as if everyone simply forgot about state law. No, an election was held every

single year, and every single year everyone declared that there simply was no one qualified to

replace defendant Sloane as Board Chair.

167    Here are the minutes for the election in 2013 after Sloane had completed one year as

Chair and was statutorily BARRED from continuing in that post for another year:

> **Election of Board Officers:**
>
> Dr. Sloane stated that pursuant to M.G.L. c. 13, sections 10 and 11, the Board is required
> to hold an annual election of officers.  Under the law, the Board is required to elect a
> Chair, Vice-Chair and Secretary from its members.
>
> Dr. Sloane stated that she would entertain a motion to nominate the Board Chair.
>
> Ms. Meyer moved to nominate Dr. Sloane as Board Chair because of Dr. Sloane's
> leadership, integrity and dedication to the Board of Registration in Medicine (BORIM).
>
> Dr. Sloane asked if there were any other nominations for Board Chair.
>
> There were no other nominations for Board Chair.
>
> Dr. Sloane asked if there was a second.
>
> Dr. Richman seconded the motion.
> Motion carried 6-0 (unanimous).

168    Going by the plain text of the statute, as applied to this private trade association, and

including the hard six-year term limit to serving on the Board continuously in any capacity,

Sloane was legally authorized to act as Chair within only the following time periods: September

2012-August 2013, September 2014-August 2015, September 2016-August 2017.

169    As a matter of law, Sloane lacked statutory authority to act and sign documents as Chair

outside of these statutorily-limited periods. *Boston Housing Authority v. National Conference of*

35

*Firemen And Oilers, Local 3.*, 458 Mass. 155 (2010)

170     Holding a sham **Saddam-style** "election" every single year, as defendant Sloane

shamelessly did for nine years in a row, does not satisfy the statutory requirement that the post of

Chair shall be rotated annually among all the board members in order to prevent concentration of

power and abuse through rent-seeking and Sherman Act violations.

171     Meaning, Sloane consciously acted without any statutory authority in January 2014,

when she, as Chair, summarily suspended plaintiff's license in violation of the Sherman Act, a

suspension that also violated evidentiary standards (substantial v. preponderance of evidence),

was counter to reasonable state policy, and occurred in the absence of active state supervision.

## NO REASONABLE STATE POLICY EXISTED TO IMMUNIZE THE DEFENDANTS

172     As documented above, only in 2018 did the Legislature establish a Commission to *study*

Medication Assisted Treatment, fully four (4) years after defendants Sloane and Abraham had

already destroyed this plaintiff's practice and excluded him from interstate commerce and the

medical marketplace.

173     Also, the state issued official Standards that specifically allowed detoxification and

sobriety.

174     In 2014, no state policy required patients to be on Suboxone for their lifetime.

175     There was absolutely no state policy at all, reasonable or otherwise, that supported the

defendants' actions to eliminate Dr. Bock from the medical marketplace in Massachusetts based

solely on his willingness to offer slow detoxification.

176     Defendants may not legitimately claim that their violation of the Sherman Act was in

pursuit of a reasonable state policy.

177     In *Gordon and Son v. Alcohol Beverages Control Commission*, 386 Mass. 64 (1982) the SJC clearly ruled: "The policy of preventing price discrimination in the sale of alcoholic beverages to Massachusetts wholesalers, as set out in G. L. c. 138, Sections 25B and 25D, is clearly articulated, affirmatively expressed, and actively supervised by the Commonwealth itself and thus is not preempted by provisions of Federal law set out in the Sherman Antitrust Act, 15 U.S.C. Section 1 et seq. (1976)."

178     On May 23, 2022, the SJC issued a published opinion in *FBT Everett Realty v. Massachusetts Gaming Commission*, SJC-13196, in which, from page 32, the court explained the factors to find that an entity is not an arm of the Commonwealth and enjoys the same independence as the Massachusetts Port Authority.

179     Unlike the Massachusetts Gaming Commission or the Alcohol Beverages Control Commission, the Board of Registration in Medicine is not under the active supervision of the executive branch as defined by the US Supreme Court, has its own trust fund to manage its own money from fees and fines that it generates by itself and that are not transferred to the general Treasury, and shall not depend on the Legislature to cover its debts.

180     For immunity to cloak the defendants' intentional destruction of plaintiff's medical practice and his elimination from the medical marketplace and interstate commerce, they are required to prove that their elimination of the plaintiff from the marketplace and interstate commerce was pursuant to a reasonable State policy *and* that their action was carried out under active State supervision.

181     This is impossible for two established reasons: (1) defendants controlled a trade

association and not an executive agency that was supervised by the Governor as an arm of the State, meaning their action was **_not_** in reality that of the State, and (2) there was no State policy supporting solely the Lifetime Subscription Model and banning detoxification or sobriety.

183   As a matter of law, any claim by defendants that they are cloaked by State action immunity automatically fails.

184   The defendants intentionally violated the Sherman Act all on their own.

### DEFENDANTS MAY NOT AVAIL OF NOERR-PENNINGTON IMMUNITY

185   The First Amendment is not implicated because the medical board is not controlled or supervised by the Commonwealth and is not an arm of the sovereign state.

186   Even if the defendants now desperately claim that they petitioned themselves as board Members - meaning Candace Sloane the individual petitioned Candace Sloane the board Chair - they are not protected by *Noerr-Pennington* immunity. Sloane and Abraham are on record confessing that they used the lapsed license excuse as a sham.

### THIS COURT IS BARRED FROM DEFERRING TO THE DEFENDANTS ON ACTS THAT VIOLATE THE SHERMAN ACT

187   Evidence within the four corners of this complaint proves that defendant Sloane and defendant Abraham controlled the board and drove the actions taken against the plaintiff.

188   Defendants produced an alleged expert to perjuriously peddle the false narrative that the Lifetime Subscription Model is state and White House-endorsed national policy and the standard of care, and did so knowing that their own expert also offers detoxification to drug addicts.

189   Defendants produced their alleged expert to solely peddle the Lifetime Subscription Model without presenting evidence of harm to one single patient cared for by plaintiff.

190    Defendants are on record admitting that they used the 'lapsed license' excuse solely as
pretext to continue plaintiff's exclusion from the marketplace and interstate commerce even after
he had been totally exonerated after four years of license suspension, and even after the SJC
ruled that they had violated the basic constitutional rights of physicians for years and years, and
had suspended licenses on the wrong evidentiary standard, without ever informing the physicians
of their right to a suspension rehearing.

191    Defendants are on record admitting that they were looking for yet another excuse to
eliminate plaintiff from the marketplace and interstate commerce even after they swore a
stipulation to the SJC that they would desist from ruining plaintiff's life again until July 2021,
and indeed again excluded plaintiff from the marketplace in October 2019, **just two (2) days
after filing that stipulation**.

192    This court is prohibited from deferring to defendants on the basis of a claimed expertise
in medical judgment, or insisting on claiming that of course the defendants always acted in good
faith out of a passionate commitment to public safety, or granting a motion to dismiss on
immunity grounds in order to not scare other physicians away from serving on the board.

> The Court has rejected the argument that it would be unwise to apply the antitrust
> laws to professional regulation absent compliance with the prerequisites for
> invoking *Parker* immunity:
>
> "[Respondents] contend that effective peer review is essential to the provision of
> quality medical care and that any threat of antitrust liability will prevent phy-
> sicians from participating openly and actively in peer-review proceedings. This
> argument, however, essentially challenges the wisdom of applying the antitrust
> laws to the sphere of medical care, and as such is properly directed to the
> legislative branch. To the extent that Congress has declined to exempt medical
> peer review from the reach of the antitrust laws, peer review is immune from
> antitrust scrutiny only if the State effectively has made this conduct its own." *Pat-
> rick*, 486 U. S. at 105–106 (footnote omitted).

39

> The reasoning of *Patrick* v. *Burget* applies to this case with full force, particularly in light of the risks licensing boards dominated by market participants may pose to the free market. See generally Edlin & Haw, Cartels by An- other Name: Should Licensed Occupations Face Antitrust Scrutiny? 162 U. Pa. L. Rev. 1093 (2014).
>
> *North Carolina Board of Dental Examiners v. FTC*, 574 U.S. 494 (2015)

193     When evaluating the inevitable motions to dismiss that demand that this court defer to the defendants' "medical expertise" or succumb to the repeatedly-trotted-out 'the sky will fall' trope that no physician would agree to be a board member if s/he will be held liable for violating the Sherman Act in the absence of active state supervision or state policy, this court is required to follow the plain text of the Supreme Court's on-point guidance in *NC Dental* and deny such motions. Also see *Kartell v. Blue Shield*, 384 Mass. 409 (1981)

194     Defendants summarily and indefinitely suspended plaintiff's medical license knowing that there was evidence in the record that he had **_not_** committed <u>gross negligence</u> or <u>repeated negligence</u> and that they were required by the board's own regulations (243 CMR 1.03(5)(a)(3)) to prove either gross or repeated negligence by plaintiff towards his own patients before they acquired the authority to **_suspend_** his medical license.

195     Violation of the board's own regulation has been declared wrong by the SJC. *DeCosmo v. Blue Tarp*, 487 Mass. 690 (2021)

196     It is settled law in every state within the United States that the interest of protecting the free market takes precedence over protecting the defendants' private assets.

COUNT ONE
(Violation of the Sherman Act, 15 U.S.C. §§ 1–7)

197    Dr. Bock re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

198    The defendants conspired and acted in concert to eliminate Dr. Bock from the medical

marketplace across the United States and from interstate commerce because he would not

commit to requiring his patients to purchase Suboxone month after month indefinitely for the rest

of their natural lives; thus, their conduct violates Section 1 of the Sherman Act (15 U.S.C. § 1).

199    The defendants repeatedly suspended Dr. Bock's license without genuine cause, and

persisted in suspending Dr. Bock's license and ground his medical practice and career into dust,

even after SJC Justice Kimberly Budd ruled that defendants had violated Dr. Bock's

constitutional rights, thereby harming the consumers of Massachusetts and New Hampshire, the

medical marketplace, and sending a clear message to other physicians that competing in the

Massachusetts marketplace shall result in license suspension unless they capitulated and forced

their patients to purchase Suboxone month after month for the rest of their lives and refused to

offer detoxification.

200    In this Circuit, Dr. Bock is required to show only that the violation of the Sherman Act by

the defendants Sloane and Abraham "created a "realistic probability" of a minimal effect on

interstate commerce." which is easily shown because Dr. Bock routinely provided medical care

to patients from New Hampshire in addition to patients from Massachusetts.

> "The Concord Wal-Mart store manager testified at trial that if the stolen money had not
> been taken, it would have been reinvested in the purchase of goods manufactured outside
> the state of New Hampshire. That evidence sufficed to show the necessary effect on

41

commerce." *United States v. Brennick*, 405 F.3d 96 (1st Cir. 2005) Also *United States v. Lopez*, 514 U.S. 549 (1995), *United States v. Morrison*, 529 U.S. 598 (2000)

201    The collusion between the defendants was intentionally aimed at eliminating competition through unlawful means, in conscious violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

202    Eliminating Dr. Bock from interstate commerce solely on the basis of his independent and knowledgeable practice of medicine, offering detoxification to those patients who consciously chose that option as allowed by official state policy, and caring about his patients more than caring about the profits generated by the Suboxone-based 'treatment' industry - both manufacturers and prescribers - violated the Sherman Act in the absence of any state policy that could cloak the defendants with state sovereign immunity.

203    The repeated summary suspensions were intended to harm healthy competition, and break Dr. Bock down such that he would finally capitulate and force all his patients onto Suboxone regardless of individual choice, as would all other physicians who would otherwise have offered detoxification. This violated the Sherman Act, 15 U.S.C. § 1.

204    The defendants' anticompetitive actions had no legitimate business or public safety objective, were not based on a showing of any harm to even a single patient cared for by Dr. Bock, and constituted a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

205    Alternatively, the collusion between the defendants in abusing their power within the medical board unreasonably restrained competition in the relevant markets and violated Section 1 of the Sherman Act under the Rule of Reason.

206    Defendants know that their actions in Massachusetts are observed in other states by both their counterparts in other medical boards via the Federation of State Medical Boards, and by

42

physicians seeking cues on what could get their licenses in trouble.

207     The defendants alone acted repeatedly and unreasonably against Dr. Bock, and are liable

under Section 1 of the Sherman Act to Dr. Bock for damages in an amount to be determined at

trial, including, without limitation, the lost business and earnings, the ongoing loss of income as

a direct result of the defendants causing Dr. Bock's hospital privileges to be stripped, and causing

a false perjurious report to be uttered to the National Practitioners Data Bank, expenses and other

losses including loss of earning power and diminished future earnings that Dr. Bock has suffered

as a direct result of the violations, which damages must be trebled pursuant to 15 U.S.C. § 15(a),

severe public contumely and loss of public reputation which led to some patients filing a lawsuit

against him based solely on the defendants' public statements, plus pre- and post-judgment

interest, costs, expenses and attorney's fees.

### PRAYER FOR RELIEF

Plaintiff Dr. Bock requests that this Court:

a. Adjudge and decree that Defendants violated the Sherman Act (15 U.S.C. § 1);

b. Award to Plaintiff to the maximum amount permitted under the relevant federal antitrust law, including treble damages as determined by a jury;

c. Award to Plaintiff pre- and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

d. Award to Plaintiff his costs, including reasonable attorney's fees;

e. Declare that offering detoxification to patients is not contrary to state policy; and

f. Order other legal and equitable relief as it may deem just and proper, including such

other relief as the Court may deem just and proper to redress, and prevent recurrence of,

the alleged violation in order to dissipate the anticompetitive effects of Defendants'

violations, and to restore competition.

Respectfully submitted, under the pains and penalties of perjury,

June 10, 2022
/s/ Randall Bock M.D.
RANDALL BOCK M.D.
*pro se*
43 Brookdale Road
Newton MA 02460-1114
phone 781-286-3000
email rbockmd@Gmail.com

44